UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES TRUSTY,

                Plaintiff,        Civil Action No. 19-12743
                                          Honorable David M. Lawson
v.                                        Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 16, 18)

Plaintiff Charles Trusty ("Trusty") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (ECF Nos. 16, 18),[1] which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that the Administrative Law Judge's

---

[1] On February 7, 2020, Trusty filed his original motion for summary judgment. (ECF No. 13). Apparently, however, Trusty did so without the benefit of an accurate version of the administrative hearing transcript; thus, on February 18, 2020, the parties stipulated to allow Trusty to file an amended motion for summary judgment (ECF No. 14), which he did on March 18, 2020 (ECF No. 16). Because Trusty's amended motion supersedes his original motion, **IT IS RECOMMENDED** that Trusty's original motion for summary judgment **(ECF No. 13)** be **DENIED AS MOOT**.

("ALJ") conclusion that Trusty is not disabled under the Act is not supported by substantial evidence. Accordingly, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 18)** be **DENIED**, Trusty's Amended Motion for Summary Judgment **(ECF No. 16)** be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

## II. REPORT

### A. Background

Trusty was 50 years old at the time of his application date of November 14, 2016,[2] and at 5'9" tall weighed approximately 190 pounds during the relevant time period. (Tr. 332, 336). He received special education and eventually graduated from high school through an Adult Education program. (Tr. 31). Previously, he worked as a CNC operator, but he stopped working when he had a "nervous breakdown" in 2008. (Tr. 336-37; ECF No. 14-1, PageID.1035-36). He now alleges disability primarily as a result of anxiety and depression, as well as chronic obstructive pulmonary disease ("COPD") and emphysema. (Tr. 206, 336, 350; ECF No. 14-1, PageID.1034, 1037).

After Trusty's application for SSI was denied at the initial level (Tr. 228-31), he timely requested an administrative hearing, which was held on May 22, 2018, before ALJ

---

[2] Trusty filed prior applications for DIB and SSI. Most recently, on January 13, 2016, ALJ Gabrielle Vitellio issued a written decision finding that Trusty was not disabled under the Act. (Tr. 178-94). The Appeals Council denied review of ALJ Vitellio's decision on November 7, 2016. (Tr. 199-204).

2

Patricia Carey (ECF No. 14-1). Trusty, who was represented by attorney Jacob Bender, testified at the hearing, as did Trusty's case worker, Todd Wright, and vocational expert ("VE") William Kiger. (*Id.*). On September 6, 2018, the ALJ issued a written decision finding that Trusty is not disabled under the Act. (Tr. 25-44). On September 3, 2019, the Appeals Council denied review. (Tr. 1-5). Trusty timely filed for judicial review of the final decision on September 19, 2019. (ECF No. 1).

The Court has thoroughly reviewed the transcript in this matter, including Trusty's medical record, function and disability reports, and testimony as to his conditions and resulting limitations. Instead of summarizing that information here, the Court will make references and provide citations to the transcript as necessary in its discussion of the parties' arguments.

### B. The ALJ's Application of the Disability Framework Analysis

Under the Act, SSI is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or

3

mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Trusty is not disabled under the Act. At Step One, the ALJ found that Trusty has not engaged in substantial gainful activity since November 14, 2016 (the application date). (Tr. 27). At Step Two, the ALJ found that he has the severe impairments of major depressive disorder, bipolar disorder; agoraphobia; major depressive disorder; anxiety disorder; COPD; and history of recurrent cellulitis associated with chronic lymphedema. (Tr. 28). At Step Three, the ALJ found that Trusty's impairments, whether considered alone or in

4

combination, do not meet or medically equal a listed impairment. (Tr. 30).

The ALJ then assessed Trusty's residual functional capacity ("RFC"), concluding that he is capable of performing light work, with the following additional limitations: can occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; can never work around hazards, such as unprotected heights or moving dangerous mechanical parts; can occasionally work outdoors in the weather, in conditions of humidity and wetness, in conditions of concentrated dust, odors, fumes, and other pulmonary irritants, in conditions of extreme heat or cold, and in conditions where vibrations are present; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (for example, no assembly line work); limited to simple work-related decisions; can respond appropriately to occasional interaction with supervisors and coworkers, but is to have no contact with the general public; limited to tolerating a few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting; and any necessary changes need to occur infrequently and be adequately and easily explained. (Tr. 33-34).

At Step Four, the ALJ found that Trusty is unable to perform his past relevant work. (Tr. 42). At Step Five, the ALJ determined, based in part on testimony provided by the VE in response to hypothetical questions, that Trusty is capable of performing the jobs of cleaner (30,000 jobs nationally), router (50,000 jobs), and inspector/tester/sorter (50,000 jobs). (Tr. 43). As a result, the ALJ concluded that Trusty is not disabled under the Act. (Tr. 44).

### C.     Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written

decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

### D. Analysis

In his motion, Trusty argues that the ALJ erred in failing to specify the weight given to the opinions of his treating psychiatrist, Luven Tejero, M.D., and his case worker, Todd Wright. (ECF No. 16, PageID.1076-81). For the reasons set forth below, the Court agrees and finds that remand is warranted.

#### 1. The Relevant Medical Evidence

On August 31, 2015, Trusty's mother, Maria Trusty, called the Lenawee County Mental Health Authority ("LCMHA"), reporting that Trusty was a "basket case" following the death of his father (in April 2015) and was scheduled to appear in court on September 2, 2015 on charges of neglect of his 12-year-old son. (Tr. 555). A few days later, Trusty presented to LCMHA with his mother for an initial assessment to determine his eligibility for services. (*Id.*). He reported experiencing a lot of anxiety and depression, as well as "severe anger," hopelessness, helplessness, and worthlessness on a daily basis. (*Id.*). He could not remember what mental health medications he was taking but indicated that they were not helping. (Tr. 555-56). On mental status examination, he was agitated and short with the clinician, refusing to answer questions without prompting from his mother, and made no eye contact. (Tr. 557). He was scheduled for a psychiatric evaluation with Dr.

7

Tejero on November 3, 2015.  (Tr. 558).

At Trusty's initial visit to Dr. Tejero, she noted that his previous diagnoses had included major depressive disorder and panic disorder, and he had been prescribed the following medications at various times for these conditions: clonidine, Remeron, Benadryl, Concerta, Seroquel, Vistaril, Lexapro, Lamictal, Intuiv, and Zoloft.  (Tr. 547).  Dr. Tejero discontinued Lexapro and Zoloft, started Trusty on Wellbutrin, and increased his dose of Seroquel.  (Tr. 550).  Trusty continued to see Dr. Tejero throughout 2016, during which time she continued to adjust his medications and dosages, as he reported ongoing anxiety and depression, as well as mood swings, hearing voices, difficulty sleeping, and fear of public places.  (*E.g.*, Tr. 534, 537 (reporting quick to anger, poor frustration tolerance, and avoiding public places in March 2016; Lamictal and Benadryl increased); Tr. 530 (hearing voices and experiencing mood swings in June 2016; Seroquel increased); Tr. 526, 529 (increased anxiety in July 2016; medication changed from Seroquel to Rexulti); Tr. 518, 521 (reporting anxiety in crowded places and auditory hallucinations; switched from Wellbutrin to Trintellix)).

On November 3, 2016, Dr. Tejero and Trusty's case worker, Todd Wright, completed a ten-page psychiatric evaluation, along with a Functional Assessment of Trusty's abilities.  (Tr. 493-506).  They indicated that his diagnoses included major depressive disorder, recurrent, severe with psychotic features, and anxiety disorder due to known physiological condition.  (Tr. 493).  They further indicated that testing performed in 2009 "would indicate a combination of Paranoid Personality Disorder and Schizoid Personality Disorder" and that recent IQ testing "revealed that [he] suffers from a Mild

8

Intellectual Disability."³ (*Id.*). After a thorough discussion of Trusty's educational, employment, and family history, Dr. Tejero noted that Trusty first sought mental health treatment with Dr. Hand in July of 2008, saying:

> Interestingly, Dr. Hand's description of [Trusty's] symptoms and issues in 2008 are in line with current symptoms and issues. Dr. Hand noted at the time [Trusty] was a "very anxiety-ridden, depressed person." He also noted auditory hallucinations, paranoia and delusions. He concluded that [Trusty] feels trapped and has frequent explosive outbursts, poor coping skills and low self-esteem. He also reported confused thinking, impaired judgment and poor short-term memory. This description would be applicable today.

(Tr. 500). Dr. Tejero and Mr. Wright concluded that issues related to cognitive limitations and Cluster A Personality Disorders have inhibited Trusty's progress in treatment, and they expected he would continue to struggle with his ability to access the community on much more than a limited basis, and likely would be restricted to attending medical appointments, transporting his mother to her medical obligations, and shopping for household items. (Tr. 501-02). They further opined that Trusty is extremely impaired in numerous functional work-related abilities. (Tr. 505-06).

Trusty continued to treat with Dr. Tejero and Mr. Wright throughout 2017, with little improvement. He continued to report anxiety and depression, hearing voices, and

---

³ On October 10, 2016, Brianne Martis, MS, LLP, completed a Psychological Assessment in order to establish Trusty's current cognitive and adaptive skill functioning. (Tr. 507-12). At that evaluation, Trusty reported a family history of mental illness, including his father (who had Schizoaffective Disorder) and his cousin (who committed suicide at age 42). (Tr. 508). Intelligence testing demonstrated that Trusty has a Full Scale IQ of 72, which is in the extremely low to borderline range. (Tr. 509). In terms of adaptive functioning, Trusty "has a difficult time following directions with more than one step, unless he is given multiple verbal reminders." (Tr. 510). Ms. Martis indicated that Trusty's lower scores on the adaptive functioning tests "are likely attributable to his lower cognitive functioning and severe depression and anxiety." (Tr. 512).

difficulty sleeping, and numerous changes were made to his medications and dosages. (Tr. 621-23, 636-40, 788-801, 843-47). On August 22, 2017, Dr. Tejero completed a Mental Impairment Questionnaire. (Tr. 809-18). In that assessment, Dr. Tejero reiterated that Trusty's diagnoses were major depressive disorder with psychosis and anxiety disorder. (Tr. 809). Dr. Tejero opined that Trusty has no useful ability to function in the abilities to: work in coordination with or proximity to others without being unduly distracted; complete a normal workday and work week without interruptions from psychologically-based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and deal with normal work stress. (Tr. 811-12). Dr. Tejero further opined that Trusty is unable to meet competitive standards in remembering work-like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention and concentration for two-hour segments; maintaining regular attendance; sustaining an ordinary routine without special supervision; making simple work-related decisions; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in a routine work setting; and maintaining socially appropriate behavior. (*Id.*). The doctor further found that Trusty has moderate restrictions in his activities of daily living, and marked difficulties in social functioning and maintaining concentration, persistence, or pace; he would experience one to two episodes of decompensation (of at least two weeks duration) within a 12-month period; and he has a residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted

10

to cause decompensation. (Tr. 813). Dr. Tejero added that Trusty would likely miss more than four days of work per month. (Tr. 814).[4] Following the issuance of Dr. Tejero's August 2017 opinion, Trusty has continued to receive mental health treatment on a regular basis, reporting many of the same feelings of anxiety, depression, and an inability to be around people. (*E.g.*, Tr. 848 (deals with the stress of living with his mother by wearing headphones in October 2017); Tr. 921 ("constantly anxious and does not want to go anywhere where he cannot freely leave" in December 2017); Tr. 853 (reporting that he "stayed in bed during the holidays" in January 2018); Tr. 927 (expressing anxiety about his mother's repeated requests to take her to the store, church, etc. in late January 2018)).

> 2. *The ALJ's Evaluation of the Medical Opinion Evidence*

The treating physician rule "mandate[s] that the ALJ 'will' give a treating source's opinion controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(c)(2)). "If the ALJ declines to give a treating source's opinion controlling weight, [the ALJ] must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Id.* (quoting

---

[4] Between November 2016 and May 2018, Dr. Tejero and Mr. Wright provided several other opinions regarding Trusty's functioning, all of which generally imposed restrictions that would render Trusty incapable of even unskilled work and would result in a finding of disability. (Tr. 358-360, 504-06, 947-51).

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given to a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527(c)(2)).  "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights.  It is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that []he is not.'" *Id.* at 937-38 (quoting *Wilson*, 378 F.3d at 544).  Thus, district courts should not hesitate to remand when the Commissioner has failed to identify the weight assigned to a treating physician's opinion and provide good reasons for that weight.  *See Schultz v. Comm'r of Soc. Sec.*, No. 15-12473, 2016 WL 457709, at *5 (E.D. Mich. Aug. 10, 2016) (citing *Cole*, 661 F.3d at 939).

Trusty now argues that the ALJ erred in evaluating the opinions of Dr. Tejero and Mr. Wright.  (ECF No. 16, PageID.1076-81).  The ALJ's evaluation of these opinions is reproduced in its entirety below:

> Although a treating physician is normally accorded greater weight, such an opinion must be supported by clinical findings.  Their assessments are not consistent with the totality of the evidence and are not supported by their own progress notes, which fail to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact as limited as Dr. Tejero and Mr. Wright allege, and they do not specifically address this weakness.  Notably, both Dr. Tejero and Mr. Wright suggested that the claimant had limited adaptive skills and had generally lived with his parents his adult life, particularly when he was not married or in a relationship with a significant other.  However, a closer examination of the record

12

>shows that the claimant had moved back in with his mother to assist in caring [for] his father, which is consistent with his earlier reports as noted by ALJ Vitellio …. Since the prior decision, additional information revealed that the claimant's father had significant psychiatric symptoms and had been treated for schizoaffective disorder, and suffered from symptoms of paranoid thoughts and delusions. Shortly before his father passed away, the claimant helped his mother also care for her grandson. After his father passed away in April 2015, the claimant continued to live with his mother, but admitted that he was taking care of his mother as the claimant [was] the only one of her four children that would help her. As discussed herein, the claimant has remained active in caring for his mother, by taking her to her medical appointments, religious ceremonies, and running errands on her behalf. Accordingly, the totality of the evidence fails to support the extreme limitations noted by his treating psychiatric providers. However, the objective clinical and diagnostic evidence used by Dr. Tejero and Mr. Wright to come to that conclusion and included in their reports have been considered.

(Tr. 41) (internal citations omitted).

As an initial matter, the ALJ erred in failing to assign a specific weight to Dr. Tejero's and Mr. Wright's opinions (e.g., some weight, limited weight, no weight, etc.), which makes any type of meaningful review difficult, if not impossible.[5] *See Schultz*, 2016 WL 457709, at *6. As set forth above, the ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record. *See* 20 C.F.R. § 416.927(c)(2). Here, although the ALJ apparently determined that Trusty's treating sources' opinions did not merit controlling weight, she failed to make clear how much

---

[5] The Commissioner concedes that "the ALJ did not explicitly state what weight the Tejero/Wright opinions were given …." (ECF No. 18, PageID.1096).

weight she assigned to these opinions based on the factors listed in 20 C.F.R. § 416.927(c)(2)-(6).

As set forth above, the ALJ primarily disagreed with Dr. Tejero's and Mr. Wright's opinion that Trusty had "limited adaptive skills," disputing their findings that he lived most of his life with others due to deficits in his adaptive functioning; noting that he helped his mother "care for her grandson"; and pointing out that he remained active in "caring for his mother" and taking her to appointments. (Tr. 41). The ALJ's conclusions in these respects are not borne out by the record evidence.

To begin with, the ALJ rejected the findings of Dr. Tejero and Mr. Wright that Trusty "had limited adaptive skills and had generally lived with his parents his adult life, particularly when he was not married or in a relationship with a significant other ([Tr. 496])." (Tr. 41). Instead, the ALJ concluded that "a closer examination of the record shows that [Trusty] had moved back in with his mother to assist in caring [for] his father …." (*Id.*). But, a thorough review of the detailed ten-page, single-spaced report written by Dr. Tejero and Mr. Wright – the very report cited by the ALJ – belies the ALJ's conclusion. Rather, in essentially describing Trusty's life history, the providers noted that after separating from a woman he married after knowing for only three months, he moved back in with his parents. (Tr. 495). He lived on his own for only about one year (1998-1999). (*Id.*). He lived with another wife, a girlfriend, and a friend before getting "homesick" and moving back in with his parents. (Tr. 496). A few pages later, Dr. Tejero describes a series of events where Trusty was bouncing back and forth between his mother's home and a girlfriend's home over the course of several years. (Tr. 499). And,

14

while Trusty did indicate at one point that he moved back in with his parents in 2013 to help care for his father (Tr. 726), the more detailed explanation – which Trusty provided when testifying at his previous administrative hearing – was that his ex-girlfriend kicked him out when her son said he was a "lowlife" because he did not have a job (Tr. 97). The providers also noted that "Vineland II Adaptive Behavior Scales results indicate significant struggles in all areas of testing – Communication, Daily Living Skills, and Socialization. His scores in all three domains were higher than or equal to less than one percent of individuals in his age group." (Tr. 502). In all of these respects, then, the primary reason given by the ALJ for discrediting the opinion of Trusty's treating providers – that they wrongly concluded he had limited adaptive skills because he generally lived with his parents throughout his adult life – is not supported by substantial evidence.

The ALJ also discounted the opinions of Trusty's treating providers based on the fact that he assisted his family members with day-to-day tasks – namely, caring for his ailing father, driving his mother around, and helping raise his mother's grandson (who is actually his son). (Tr. 41). Trusty argues, however, that there is a difference between "effort" and "outcome" in these respects, and while Trusty might have put forth effort in these areas, he was unable to complete these tasks in a "normal" fashion. (ECF No. 16, PageID.1078). The Court finds merit to this argument.

With respect to Trusty's son, the evidence shows that Trusty was unable to effectively parent him, and his son repeatedly ran away from home, was arrested on drug charges (at 11 years old), and was eventually placed in a residential facility when Trusty was encouraged to give up his custody rights. (Tr. 499). This hardly amounts to

15

successfully "help[ing] his mother [] care for her grandson[,]" as the ALJ characterizes it. (Tr. 41).

The record also shows that Trusty was not particularly helpful in "taking care of his mother[,]" as the ALJ asserts. (Tr. 41). Indeed, while Trusty says that he took care of his parents, closer questioning revealed that his mother normally does the cooking and the dishes (because Trusty too often does a poor job and they need to be cleaned again). (ECF No. 14-1, PageID.1047). Mr. Wright testified at the administrative hearing that Trusty's mother does all the cooking, cleaning, and handles all the bills. (*Id.*, PageID.1051). He further testified that if Trusty's mother were no longer able to take care of him, he would need community living support services[6] to make sure he is taking his medication, eating properly, and paying his bills on time. (*Id.*). Moreover, although the ALJ noted that Trusty takes his mother to medical appointments, religious ceremonies, and runs errands on her behalf (Tr. 41), the evidence shows that he is too anxious to leave the car and waits for her outside the doctor's office or church (Tr. 11). And, while Trusty runs errands for his mother, they are limited in scope, and she often calls ahead to a small store and asks them to place items by the register for Trusty (so he can get them quickly and spend as little time around people as possible). (Tr. 11). Thus, the ALJ's mischaracterization of these activities is also problematic.

The Commissioner argues that, in addition to finding that Trusty's daily activities

---

[6] Mr. Wright testified that he felt Trusty would benefit most from living in a group home (if his mother was no longer able to care for him), but indicated Trusty would be too anxious being around that many people for group home placement to be successful. (ECF No. 14-1, PageID.1051-52).

16

were incompatible with the Tejero/Wright opinions, the ALJ provided additional good reasons for not giving Dr. Tejero's "checked responses"[7] controlling weight – namely, that they were inconsistent with her treatment notes and the record as a whole. (ECF No. 18, PageID.1097, 1099). The Commissioner concedes that the ALJ's "explanation on this point was perhaps too succinct" but proceeds to try to rehabilitate the ALJ's analysis by citing to findings regarding Trusty's speech, eye contact, insight, judgment, mood, and affect. (*Id.*, PageID.1097, 1099-1100). However, the ALJ did not specifically identify these findings as inconsistent with the Tejero/Wright opinions; rather, she focused on Trusty's purported activities of daily living as the primary basis for rejecting their opinions. (Tr. 43). The Commissioner cannot remedy the ALJ's evaluation of the Tejero/Wright opinions, as such *post hoc* reasoning is forbidden. *See, e.g., Mendyk v. Comm'r of Soc. Sec. Admin.,* No. 18-11730, 2019 WL 4053949, at \*7 (E.D. Mich. Aug. 7, 2019) ("While the Commissioner attempts to rehabilitate the ALJ's lack of reasoning on this point by citing to other record evidence that could support the ALJ's finding …, that is precisely the type of analysis the ALJ should have undertaken in the first place, but did not. Fundamentally, it is the responsibility of the ALJ, not the Court nor the Commissioner, to evaluate the relevant evidence in the first instance; the fact that the Commissioner now offers post hoc justifications for the ALJ's conclusion is simply insufficient."); *see also Christephore v. Comm'r of Soc. Sec.*, No. 11-13547, 2012 WL 2274328, at \*6 (E.D Mich.

---

[7] As set forth above, in addition to completing a Functional Assessment of Trusty's abilities, which contained "checked responses," Dr. Tejero and Todd Wright also completed a ten-page psychiatric evaluation, providing substantially more detail than the Commissioner implies. (Tr. 493-506).

June 18, 2012) ("[I]t is the ALJ's rationale that is under review, not defense counsel's.").[8]

The foregoing makes clear that the ALJ's decision to reject the opinions of Trusty's treating providers is simply not supported by substantial evidence and is not the product of an even and thorough weighing of the competing evidence in the record. *See Trudell ex rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) ("'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'") (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). As such, remand is warranted.

### III. CONCLUSION

For foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment **(ECF No. 18)** be **DENIED**, Trusty's Motion for Summary Judgment **(ECF No. 16)** be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to

---

[8] The Commissioner also makes a number of procedural arguments, none of which the Court finds persuasive. For example, the Commissioner argues that since Trusty testified at his previous hearing regarding his living situation, he is now barred from elaborating on that testimony, since that earlier ALJ decision became final. (ECF No. 18, PageID.1101). The Commissioner cites no authority in support of this proposition, however, and it seems to contradict the very purpose of allowing a claimant to introduce new evidence at a subsequent hearing. Additionally, the Commissioner argues that although Trusty challenged the ALJ's evaluation of the evidence pertaining to the assistance he provided to family members, he did not challenge the ALJ's handling of essentially the same evidence at Steps 2 and 3 of the sequential evaluation process. (*Id.*, PageID.1101-03). Again, however, the Commissioner cites no case law or regulation in support of his argument, and the Court finds it without merit.

sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** for further proceedings consistent with this Report and Recommendation.

Dated: September 30, 2020  s/David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
  United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 30, 2020.

                                                    s/Eddrey O. Butts
                                                    EDDREY O. BUTTS
                                                    Case Manager